[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON PETITION TO TERMINATE PARENTAL RIGHTS
By a petition filed on August 31, 1990, the Commission of the Department of Children and Youth Services (DCYS) seeks to CT Page 8377 terminate the rights of Debra F. and Kenneth J. in and to their son, Romell who was born on March 17, 1988. The petition was brought pursuant to General Statutes Section 17-43a (now Section 17a-112) whereby the court has jurisdiction with respect to any child previously committed to DCYS in accordance with General Statutes Section 46b-129(d). Romell was found to be uncared for on March 7, 1989 and was committed on that date for eighteen months. Subsequently the commitment was extended until March 7, 1992.
The petition alleges the existence for a period of not less than one year of the following statutory grounds permitted for the non-consensual termination of parental rights.
 (1) Section 17a-112(b)(1): The child has been abandoned by his parents in the sense that the parents have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.
 (2) Section 17a-112(b)(2): the parents of a child who has been found to have been uncared for in a prior proceeding have failed to achieve much degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in his life.
 (3) Section 17-112(b)(4): There is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.
Petitions to terminate parental rights are unique and severe actions. For these reasons, this court has always preceded its factual findings and analysis of the allegations with an explanation of the structure of a termination case.
A petition to terminate parental rights consists of two phases, adjudicatory and dispositive. Practice Book Sections CT Page 8378 1042, 1044, 1049. The two phases, however, do not have to be the subjects of separate hearings. One unified trial, such as occurred in this case, is permissible. In re Barbara J.,215 Conn. 31, 47 (1990).
Although the procedure of one trial is sanctioned, the two phases serve distinctive purposes. In the adjudicatory phase, the court determines the validity of the grounds alleged in the petition and, hence, is limited to events preceding the filing date of August 31, 1990. The dispositive phase is concerned with what action should be taken in the best interest of the child and, as to that phase, the court is entitled to extend its consideration to matters occurring until the end of the trial which, in this case, was July 22, 1991. In re Juvenile Appeal (84-AB), 192 Conn. 254, 267 and n. 14. The dispositive phase is not reached unless at least one of the statutory grounds alleged in the petition is proven by clear and convincing evidence. General Statutes Section 17a-112(b); Practice Book Section 1049; In re Migdalia M., 6 Conn. App. 194, 208, cert. denied 199 Conn. 809
(1986).
Attached to the petition is an addendum in which DCYS has inserted three statements of fact, namely (1) "Romell F. has been in foster care for one year and ten months. (2) Romell F.'s mother, Ms. Debra F., has been offered rehabilitative services but has failed to follow through [and] (3) Romell F.'s father, Kenneth J., has been unavailable to both his son and the Department of Children and Youth Services due to a history of incarcerations, a brief placement in the Job Corp (sic) and being whereabouts unknown for 5 months." At the trial none of the parties treated the addendum as a limitation upon proof.
The trial was conducted on April 8 and 26 and on May 3, 1991. The petitioner's brief was filed on May 28, 1991 and briefs for the child and the respondents were filed on July 2, 1991. On the motion of DCYS, the case was opened on July 22, 1991 to receive additional evidence. At the trial, testimony was received from Nancy Wilcox, DCYS social worker; Ann James, foster mother; Michael Howard, program supervisor for New Directions, a social service program; Douglas Henry, clinical psychologist at Catholic Family Service; Dr. Howard Krieger, psychologist; Debra F. and Kenneth J. Submitted as documentary evidence were the DCYS termination study, Dr. Krieger's psychological evaluations of Debra F. and Kenneth J. and his covering letter, in the nature of a report, to Nancy Wilcox, Treatment plans of DCYS dated May 19, 1989, November 19, 1989 and May 19, 1990, and notices to the respondents from Nancy Wilcox concerning visits in May, June and July, 1991.
Debra F. arrived late for the hearing on April 8, 1991, was CT Page 8379 present on May 3, 1991 but was absent on April 26 and July 22, 1991. Kenneth J. was absent on April 8 and 26 but was present on May 3 and on July 22. On the latter date, he was incarcerated and was brought to court by personnel from the Department of Correction.[1]
 II.
From the evidence presented, the court finds that the following facts have been established.
Debra was pregnant with Romell before she was committed to Long Lane School. She received outpatient prenatal care at St. Mary's Hospital and prenatal care was continued at Long Lane. Romell was born at St. Mary's and in October 1988, Debra, who was on AWOL status returned to Long Lane leaving Romell with Kenneth's mother. Mrs. J. gave Romell to Debra's mother, Mrs. F., who, in turn, gave him to DCYS for foster placement. Romell was placed in the home of Ann James. Since the placement, Romell has always resided with Mrs. James who now wishes to adopt him.
On January 20, 1989, when Romell was ten months old, DCYS filed an uncared-for petition on the ground that he was homeless. This petition listed Debra as the only parent. The allegations of homelessness were that Debra being committed to Long Lane was unable to provide a home for her son and that no appropriate relatives were available to care for him.
Nancy Wilcox, the DCYS social worker met with Debra at Long Lane on March 3, 1989. At the interview, Miss Wilcox was informed that Kenneth was Romell's father. At the time, Kenneth was also an inmate at Long Lane and Miss Wilcox contacted him. Based on her interviews with Debra and Kenneth, Nancy Wilcox on March 7, 1989 filed the social study required by Practice Book Section 1044 with the court. In the social study, Miss Wilcox noted that Debra's parents have a long history with DCYS which includes the neglect of Debra and her siblings. Also mentioned were the maternal grandmother's psychiatric problems and the maternal grandfather's abuse of alcohol. According to the social study, other maternal relatives who were aware of Romell's situation failed to come forward with an appropriate plan for him. With respect to the paternal family, Miss Wilcox wrote that Kenneth's mother was aware of the situation but she, too, failed to come forward with an appropriate plan for Romell. Kenneth's father was reportedly incarcerated. Among the "strengths" noted by the social study were Debra's apparent concern and desire to work toward reunification with Romell following release from Long Lane as well as the child's good health and appropriate development.
The uncared-for petition was granted with Debra's agreement CT Page 8380 on March 7, 1989 and Romell was committed for eighteen months.[2]
When the commitment was ordered, Debra and Kenneth were both 16 years old.
Following Romell's commitment, Debra's status as an inmate of Long Lane continued. On March 13, 1989, however, she received a one-day pass and went AWOL again during a visit to the foster home. She did not return to Long for one month. Nancy Wilcox went to see Debra on April 26, 1989 and admonished her to stop running away and to concentrate on her discharge.
On May 19, 1989, while Debra and Kenneth remained incarcerated at Long Lane, DCYS formulated a treatment plan for Romell. Page one of the plan dealt with Romell's health and reported the following items: he recently was diagnosed as being developmentally delayed in the areas of language and gross motor skills; there was a question regarding his hearing; statements had been made indicating that poor muscle tone had resulted in poor quality of movement; a referral to an early intervention program in the New Haven area will be made by DCYS; he is being seen by an orthopedic doctor who has recommended a brace and special shoes to straighten his legs and assist him in walking. Page one of the treatment plan also mentioned the continued incarceration at Long Lane of both parents and stated that visitation had been hindered by Debra having been AWOL.
The closing paragraph on page one of the treatment plan concerned Debra's desire to have Romell returned. Miss Wilcox wrote that in order for this wish to be accomplished, Debra "will need to adhere strictly to the goals and objectives outlined in the . . . plan. Five goals were set forth. On Debra's release from Long Lane she was (1) to secure a stable living situation; (2) attend counseling sessions at New Directions as arranged by the Long Lane staff; (3) to attend parenting classes as arranged by DCYS; (4) to visit Romell as arranged by DCYS; (5) to establish how she will provide for Romell economically. The target date for accomplishment was set by DCYS for November, 1989.
Nancy Wilcox informed Debra of DCYS's expectations prior to her release in early June, 1989. On June 6, there was a review in court. The records show that Debra and DCYS were in agreement as to the provisions of the treatment plan dated May 19, 1989.
When released from Long Lane, Debra returned to her parents' house. She resisted or was unsuccessful in the recommended counseling and parenting programs. New Directions was an after-school program operated by Connecticut Junior Republic which offered counseling, academics and recreation. Debra enrolled but dropped out soon after she was assigned to a group. She refused to attend the recommended parenting program at St. Mary's CT Page 8381 Hospital. A similar lack of success occurred with a parenting program of eight or nine sessions at Catholic Family Services that DCYS had recommended for Debra and Kenneth in October, 1990. Mr. Henry described their referral as "forced."
Kenneth was discharged from Long Lane to the Job Corps in Massachusetts on January 9, 1990. He left the Job Corps on February 6, 1990 because of problems at home. Since leaving the Job Corps, Kenneth has been unemployed and in 1990 and 1991 he was in jail on a gun charge and for failure to appear. At the commencement of the trial, Kenneth was the unemployed head of his household receiving welfare and caring for younger siblings.
DCYS paid less attention to Kenneth than to Debra. Although Nancy Wilcox was aware of Kenneth's fatherhood, he was not added to the uncared-for petition. With the possible exception of the program at Catholic Family Services, no rehabilitative services were planned for or recommended to him. When Kenneth was confined to Long Lane, Miss Wilcox brought Rommel to visit only once. After Kenneth returned to Waterbury, he, rather than Miss Wilcox was the initiator of contacts.
The foster home is in East Haven. It was selected by Nancy Wilcox who informed the court that when the placement was made, there were no suitable foster homes available in the Waterbury area. Thereafter, no efforts were made by DCYS to move Romell closer to Waterbury. According to Miss Wilcox, neither parent requested a closer placement. Debra and Kenneth, however, did suggest her aunt, Helen Love, as a possible placement resource. Miss Wilcox went to the Love home and sent licensing forms to Mrs. Love. When the forms were not returned, Miss Wilcox declined to conduct a further investigation. Kenneth also suggested Debra's mother or his mother as placement resources. The maternal grandmother was considered to be unsuitable by DCYS. Miss Wilcox did confer with the paternal grandmother but apparently the conference did not promote any further action.
The distance between the foster home and the parents residences caused problems with visitation. In Nancy Wilcox's reports, the distance between Waterbury and East Haven is described euphemistically as forty-five minutes and that may be so if the traveling is done by automobile. Neither Debra nor Kenneth have drivers' licenses, own cars or have cars readily available for their use. Visits were conducted pursuant to Nancy Wilcox's schedule of one visit for 1-1/4 hours per month as she drove the parents to East Haven. Later, Miss Wilcox agreed to two visits per month one with her driving and for the other the parents were to provide their own transportation which they could not successfully arrange. Debra, therefore, was limited to Miss Wilcox's driving schedule while Kenneth reported that he went to CT Page 8382 visit in East Haven twice in a friend's car. Even if either parent should have attempted the lengthy bus ride, there was no evidence to show that they knew how to get from the center of New Haven to the foster home in East Haven via public transportation. Further, both parents were unemployed and Nancy Wilcox never offered them bus passes which are a standard feature of DCYS' method of operation. By Nancy Wilcox's count, there were twelve visits scheduled in East Haven between October, 1990 and April 23, 1991 of which Debra and Kenneth attended five together and Debra attended two more without him. For two visits neither parent showed up and two more were canceled and later rescheduled by Nancy Wilcox.
Ann Jones, the foster mother is 55 years old. Aside from Romell, there are four other persons living in her home: Joseph, aged 20 who she has adopted and who is a student at a school for slow learners; Andrew, a foster child of twenty months; Precious, another foster child of four months; and her granddaughter who is fifteen months. She has an adopted daughter who is an adult and available for emergencies. Ann James has been a foster mother for thirty-three years and has cared for between fifty and sixty foster children. All of her charges, Romell included, call her "Mommie." Romell gets along well with the other children.
One factual assertion by DCYS concerning Ann James requires correction. In the mandated social study prepared by Nancy Wilcox, there are references to Mrs. James and her husband as prospective adopting parents. In reality, Mr. James is not a figure in the contemplated plan of adoption for the reason that Ann James is separated from her husband.
On September 25, 1990, after the filing of the termination petition, DCYS, pursuant to General Statutes Section 45-61f(d) (now Section 45-717(d)) moved for psychological evaluation of Debra and Kenneth and a parent-child evaluation. Judge Santos granted the motion and Dr. Krieger examined Kenneth on October 23, 1990 and Debra on November 13, 1990. Although Dr. Kreiger's evaluations took place after the filing date, they referred to events or conditions that necessarily preceded the petition and should be considered as part of the adjudicatory phase.
Dr. Kreiger's examinations consisted of psychological testing preceded by an interview. From the test results, he concluded that both Debra and Kenneth functioned in the mild range of mental retardation. Their achievement scores were substantially below grade level a fact which Dr. Krieger attributed to poor educational efforts compounding low cognitive abilities and, in Kenneth's case, further aggravated by the "dyslexia" of which he had complained. Debra was characterized as a person who is passive, compliant and depressed. Kenneth was described as mildly CT Page 8383 depressed. Recommended for Debra were parent training, social skills training and supportive psychotherapy. For Kenneth the recommendations were educational efforts geared to vocational achievements and supportive counseling.
Dr. Krieger recommended termination of parental rights and adoption of Romell by Ann James primarily because she was the child's psychological parent. His assessments of Debra and Kenneth, however, were not ones that indicated that they would make poor parents. In his report, he noted that although visitation by Debra and Kenneth had been sporadic and of limited affective involvement, such visitation appeared to be a positive experience in that Romell recognized his parents. At the trial, Dr. Krieger described the once per month visits as a seriously limiting action. He had recommended increased visits to DCYS.
As with Nancy Wilcox's social study, there is an item in Dr. Krieger's report concerning the parent-child interaction that should be corrected. At the end of the report, Dr. Krieger wrote "[e]fforts will certainly need to be made to assist Debra and Kenneth regarding the parenting of their young daughter Patricia." Patricia, who was born in March, 1990, is Debra's second child but by a man other than Kenneth. For Patricia, Debra receives APDC through the Department of Income Maintenance. A social worker from that department has registered Debra for section 8 housing. And when the subsidized apartment becomes available, the state will assist in its furnishing. Despite DCYS' extensive past involvement with Debra's family, there have been no complaints regarding her care of Patricia.
Nancy Wilcox was aware of Dr. Krieger's recommendation of increased visitation. She discussed the recommendation with Ann James and they decided that two visits per month were all that could be arranged. This decision is apparently what caused Nancy Wilcox to offer a second monthly visit to Debra and Kenneth provided they furnished their own transportation.
Supplementing the foregoing finding of facts are some further findings which appear in subsequent sections of this memorandum.
 III.
Clear and convincing evidence, the required standard of proof in termination actions, has received both quantitative and qualitative definitions. Quantitatively, clear and convincing evidence has been described as a level of persuasion lying between the usual civil requirement of proof by a fair preponderance of the evidence and the requirement in criminal cases of proof beyond a reasonable doubt. Cookson v. Cookson, 201 Conn. 229, 234
(1986). Qualitatively, clear and convincing evidence has been CT Page 8384 defined as proof sufficient to satisfy a court beyond an average certainty. In re Juvenile Appeals (84-3), 1 Conn. App. 463, 468, cert. denied 193 Conn. 802 (1984).
 A.
Abandonment, the first ground asserted in the petition is defined by Section 17a-112(b)(1) as a parent's failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of [his or her] child." The statutory definition differs from the common law concept of abandonment wherein an intent to abandon totally and permanently must be established. See e.g. Litvaitis v. Litvaitis, 162 Conn. 540,547 (1972); Kantor v. Bloom, 90 Conn. 210, 213 (1916).
The Appellate Court has discussed statutory abandonment in the context of parental responsibilities set forth in an earlier decision of the Supreme Court. In re Rayna M., 13 Conn. App. 23,36-37 (1987). The Supreme Court, in In re Juvenile Appeal (Docket No. 9489), 183 Conn. 11, 15 (1981), stated that the commonly understood obligations of parenthood entailed the following minimum attributes: "(1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance."
The extent to which specific parents should be held to the performance of all or some of the above stated obligations must depend in large part on the particulars of a given case. In characterizing statutory abandonment, the Supreme Court has emphasized that the focus is on the parent's conduct and that the question is one of fact to be resolved by the trial court in the light of relevant circumstances. In re Juvenile Appeal (Docket No, 9489), supra at 14.
Consideration must be given to the status of Debra and Kenneth as noncustodial parents since Romell was placed with DCYS at 10 months. Further, to the facts already found some additional ones must be added. Nancy Wilcox never set a specific date in each month for visitation. Either Debra or Kenneth had to call her and request that a visit be arranged. From this procedure, the number of visits that were accomplished is cogent demonstrations of parental interest and concern.
The remaining contentions of DCYS are simply insufficient to contradict the accomplished visits or to establish abandonment. Neither parent sent cards or gifts. From the testimony of Debra and Kenneth a lack of finances was one reason and from Dr. CT Page 8385 Krieger's report a lack of imagination could be another reason. Particularly specious is the claim appearing in the social study that Debra never provided economically for Romell. The social study, and Nancy Wilcox's testimony as well, ignored Debra's subsequent pregnancy, the birth of Patricia, and Dr. Krieger's evaluation. For most work, Debra lacks both innate ability and educational skills.
 B.
The second ground asserted for termination is that after the uncared-for adjudication on March 7, 1989, the parents "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering [Romell's] age and needs, they could assume a responsible position in [his] life. . . ." General Statutes Section 17a-112(b)(2). What is a reasonable time presents a question of fact. Northeast Electrical Contractors v. Udolf, 1 Conn. App. 169, 172 (1984). The age and needs of the child present other fact bound questions. In re Shannon S., 41 Conn. Sup. 145, 155 aff'd. 19 Conn. App. 20 (1989).
On August 31, 1990, when the termination petition was filed, Romell was a two year old child with some developmental and orthopedic problems. To be sure, the disinclination of Debra and Kenneth to participate in arranged counseling or parenting programs is not a good prediction of future ability. But Section 17-112(b)(2) does not provide that in order to achieve personal rehabilitation a parent must meet court-ordered expectations. In re Migdalia M., supra at 206. The same analogy should apply to a failure to participate in programs recommended by DCYS.
The evidence produced some positive aspects that cannot be ignored. Dr. Krieger, in his evaluations, found that the specifics of the case did not indicate that Debra or Kenneth would make poor parents. Both Debra and Kenneth professed love for their child and have participated in his life to the extent that DCYS permitted. Debra, through her care of Patricia, has demonstrated a capability for child-rearing. The same, albeit to a lesser degree, can be said for Kenneth from his care of younger siblings.
The phrase "personal rehabilitation", as used in Section 17-112(b)(2) refers to "the restoration of a parent to his or her former constructive and useful role as a parent." In re Raynor M., supra at 32; In re Migdalia M., supra at 203. Although this standard presupposes a former condition that usually was nonexistent, the court, from the evidence presented, cannot find that DCYS has proved clearly and convincingly that either Debra or Kenneth failed to achieve the degree of personal rehabilitation that the statute requires. CT Page 8386
 C.
An absence of an ongoing parent-child relationship, the third ground asserted by DCYS has a two-pronged test as is evident from the language of General Statutes Section 17a-112(b)(4). Clear and convincing evidence must demonstrate the absence of a relationship "that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child." Clear and convincing evidence must demonstrate also that "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
If the statutory language were to be taken at face value, the first prong with its "day to day" criteria would rarely, if ever, be satisfied by a noncustodial parent. In re Luke G., 40 Conn. Sup. 316,324-25 (1985). Recently, the Supreme Court opined that the language of the first prong" is inherently ambiguous when applied to noncustodial parents who must maintain their relationships with their children through visitation." In re Jessica M., 217 Conn. 459, 468 (1991). Before In re Jessica M., however, judicial construction had turned the question of the existence of a parent-child relationship into something that is quite different from the literal statutory wordage.
An absence of a parent-child relationship contemplates situations where a child has never known his or her parents so that no relationship ever developed between them or where the child has definitely lost that relationship so that despite its former existence it now has been completely displaced. In re Juvenile Appeal (Anonymous), 181 Conn. 638, 645 (1980), In re Juvenile Appeal (Anonymous), 177 Conn. 648, 670 (1979). As initially stated in decisional law, proof of a lost or displaced relationship depended upon whether the child had present memories or feelings or feelings for the natural parent. In re Juvenile Appeal (Anonymous), supra, 181 Conn. at 646, In re Juvenile Appeal (Anonymous), supra, 177 Conn. at 670.
Later decisions from the Appellate Court narrowed the original test. The terms "memories of" and "feelings for" refer to specific memories and positive feelings. In re Rayna M., supra at 34-35; In re James T., 9 Conn. App. 608, 616 (1987); In re Juvenile Appeal (84-6), 2 Conn. App. 705, 709 (1984), cert. denied195 Conn. 801 (1985). The importance of In re Jessica M., supra, is that in the decision, 217 Conn. App. at 470, the Supreme Court approved the Appellate Court's interpretation of what is now Section 17a-112(b)(4)[3].
In Dr. Krieger's report, he wrote that "Romell seems to be CT Page 8387 aware of his mother and father, however, clearly is significantly attached to Mrs. James, who is clearly the psychological parent in this case." At the trial, when cross examined by Debra's attorney, Dr. Krieger stated that the child recognized his mother. Dr. Krieger's report and testimony were somewhat at variance with the testimony of Nancy Wilcox who stated that the visits in the foster home were "bland" in that Rommel allowed his parents to hold him but that there was no interaction between them and that the child did not recognize Debra as his mother. Debra admitted that sometimes during the visits in the foster home, Romell was "standoffish" and would not come when she called him.
The offered testimony did not establish the absence of a parent-child relationship. At most, it tends to show that possibly Romell had ambivalent feelings toward his parents. Pertinent here is the following statement from In re Jessica M. "While evidence of a child's ambivalent feelings toward a noncustodial parent would not alone justify a finding that `no ongoing parent-child relationship exists', it is nevertheless reasonable to construe this statutory ground for termination to require a finding that no positive emotional aspects of the relationship survive. 217 Conn. at 470. In re Jessica M., supra at 471-72, upon a review of legislative history, also establishes that no ongoing parent-child relationship is a different concept from no meaningful parent-child relationship. DCYS has failed to meet its burden of establishing the lack of an ongoing parent-child relationship.
Having found the first prong not proven, the court is precluded from considering the second prong. There is no general best interest test that supplants the statutory requirements. "A parent cannot be displaced because `someone else could do a better job' of raising the child." In re Jessica M., supra at 467 quoting Corey L. v. Martin L., 45 N.Y.2d 383, 391,380 N.E.2d 266, 408 N.Y.S. 439 (1978).
 IV.
Since none of the three grounds asserted for termination were proven, there is no cause to enter into the dispositional phase. Some statements, however, are pertinent and should be made. The court's decision does not return Romell to parental custody. He remains committed to DCYS on the present extension of his original commitment. When the termination trial started, the court required DCYS to bring Romell to Waterbury for visits twice per month. It is anticipated that, at a minimum, this schedule will be continued. DCYS is reminded that the agency's statutory charges include a duty "to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care." General Statutes Section 17a-101(a). The parents, CT Page 8388 especially Debra, should understand that reunification with the child might be accomplished or hastened by participation in appropriate parenting programs. Finally, the parents are forewarned that unexcused and unexplained absences from hearings can affect future dispositions. See In re Bobby Jo S., 10 Conn. App. 36,41 (1987).
 V.
The petition to terminate the parental rights of Debra F. and Kenneth J. in and to their minor son Romell F. is denied.
BARNETT, J.